UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.                                        Case No.  09-CR-155 (LSA)

JACOB D. COLLINS,

                    Defendant.

## MEMORANDUM IN AID OF SENTENCING

          The United States of America, by its attorneys, Michelle L. Jacobs, United States Attorney

for the Eastern District of Wisconsin, and John J. Manning, Assistant United States Attorney, hereby

files this Memorandum in Aid of Sentencing.  The defendant unlawfully obtained a firearm for his

friend, Julius Burton.  A little over a month later, Burton used that firearm to intentionally shoot two

Milwaukee Police Officers at close range.  Both officers were hit in the head and severely injured.

The attempted murder of police officers engaged in the lawful discharge of their duties strikes at the

very heart of a civilized society of laws.  Because of the nature of this offense and overwhelming

need to deter the unlawful distribution of firearms, the United States respectfully requests that this

Court impose a sentence of the statutory maximum term of imprisonment.

## BACKGROUND

          On June 9, 2009, during a routine street encounter, Julius Burton produced a firearm and shot

Milwaukee Police Officers Graham Kunisch and Bryan Norberg in their heads.  Officer Norberg was

shot in the mouth.  The bullet severely damaged his teeth, resulting in a number being lost.  The

1

bullet exited from his cheek and lodged in his shoulder. The bullet was finally removed from his shoulder during the week of December 15. He has permanent disfigurement in his face, and has been unable to return to duty because of his limited use of his arm. Officer Kunisch was shot in the head and lost his eye. There was also some damage to his brain as a result of the bullet's trajectory. He recently had additional bullet fragments removed from his face. He was also hit in the hand and has had to have significant reconstructive surgery on his hand.

Burton was subsequently arrested hiding in the basement of a house in the 900 block of South 3rd Street. A loaded Taurus Model PT140 .40 caliber pistol with serial number SC027383 was recovered from the arrest scene. A trace on the firearm indicated that the weapon was purchased by Jacob D. Collins from Federal Firearms Licensee (FFL) Badger Guns, Inc., at 2339 South 43rd Street, West Milwaukee, Wisconsin.

ATF agents recovered a copy of ATF Form 4473 from Badger Guns on June 9, 2009, and confirmed that Jacob D. Collins filled out the form on May 2, 2009, and reaffirmed his answers when he picked up the handgun on May 4, 2009. Question 11a on the form asked:

> **Are you the actual transferee/buyer of the firearm(s) listed on this form? Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. (See Instructions for Question 11 a) Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11a and may proceed to question 11b.**

A review of the form completed by Collins shows that Collins appears to have initially checked the box marked, "No," but then checked the box marked, "Yes." He wrote the initials "JC" above the

box marked, "No." The certification section of the form, which Collins signed and dated on May 2, 2009, explicitly advised him that a false answer to question 11a was punishable as a felony under federal law.

In addition, Collins falsely listed his home address as 33XX North 27th Street, Milwaukee. And to question 11e, which asked, "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?" he falsely checked the box marked, "No."

On June 10, 2009, ATF Task Force Agents located Collins at 20XX West Lapham Street, Milwaukee. Collins was arrested on outstanding warrants, and was in possession of a single potted marijuana plant. Collins was advised of, and waived, his *Miranda* rights. In signed and recorded statements, Collins admitted that about a month earlier, he was approached by a friend whom he knows as "Julius," but who goes by the nickname "Squash," and whom Collins called "J-Dub." Collins subsequently identified "Julius" as Julius Burton from a photo array.

At that time, Burton asked Collins to purchase a handgun for him because he was only 18 years old and did not think he could buy one. Burton told Collins that he had been jumped by some people on the east side and that these people told Burton that if they saw him again, they would shoot him. Burton said he wanted the gun to protect himself. Collins then agreed to purchase a handgun for Burton in exchange for a payment of $40. In early May, 2009, Burton, his uncle or cousin, and an unidentified woman arrived at Collins' house in a van, and drove Collins to Badger Guns, Inc. On the drive, Burton gave Collins approximately $420 for the purchase of the handgun. Upon arrival, all of them entered the store, and Burton picked out a grey and black Taurus .40 handgun, and stated, "That's the one I want."

3

Collins then informed an employee that he wanted to purchase that handgun, and filled out the paperwork. Collins confessed that he lied when he answered question 11a, as he was not the actual purchaser of the firearm. Collins stated that he initially answered, "No" because he did not understand the question, and explained that the store owner told him, "Read the form, and put down what you think is right, I can't help you with the form." Collins then re-read the form, and stated that he knew that even though what he was doing was wrong and that he had a "gut feeling" something bad was going to happen, he had to answer "Yes" if he wanted to get the gun for Burton and get the $40.

Collins also admitted that he lied when answering question 11e, as he had smoked marijuana approximately once per week since 2007. Finally, he falsely listed an old address, 33XX N. 27th Street (where he has not resided for years), as his current address, because Burton advised him to do so, in case the police came looking for him.

Collins further stated that approximately two days after filling out the paperwork, Burton and another man drove Collins back to Badger Guns. Burton declined to enter the store with Collins because he was worried about someone seeing him. Burton asked Collins to purchase ammunition for the weapon, promising to give him an extra $20. Collins agreed, but declined to purchase other items requested by Burton, such as extra magazines, because he "had a bad feeling." Collins then entered the store alone and met with a different employee. After reviewing the ATF form again and signing it, he picked up the handgun. Collins then left the store, and met with Burton in the parking lot. The two then rode on the bus back to Collins' home on Lapham Street. Once there, Burton paid Collins a total of $60 for the gun and ammunition. Burton asked Collins to hold onto the gun for him for a few days. Burton said he was going home and was not going over to the east side. Burton

4

said that when he was going over to the east side he would come and get the gun. Two days later, Burton returned to Collins' home and picked up the gun and ammunition.

Collins spoke with Burton again a few weeks later, and Burton advised that he fired the gun while at his mother's home on Capitol Drive, and had also tried to scrape the numbers off of the gun. Burton also asked Collins to report the gun as stolen, but Collins never did.

The Taurus Model PT140 .40 caliber pistol with serial number SC027383 was not manufactured in the State of Wisconsin, and, therefore, traveled in interstate commerce before its purchase, possession, and distribution by Collins.

On September 11, 2009, the defendant pled guilty to the two counts of an indictment, which charged him with violations of Title 18, United States Code, Sections 922(a)(6), 922(g)(3), and 924(a)(2). Sentencing is now set for January 7, 2010.

## SENTENCING GUIDELINES CALCULATIONS

As detailed in the PSR, each of the offenses to which the defendant pled guilty carries a maximum term of imprisonment of 10 years, and a maximum fine of $250,000. Each count also carries a maximum term of three years of supervised release, and a mandatory special assessment of $100. Under the Sentencing Guidelines, the two counts are grouped together pursuant to § 3D1.2(d). The base offense level for both counts is 14 under § 2K2.1(a)(6).

The PSR correctly adds a four point enhancement under § 2K2.1(b)(6) because the defendant transferred the firearm to Burton with reason to believe that it would be used or possessed in connection with another felony.[1] As detailed above, several facts establish that the defendant was

---

[1] The Sentencing Guidelines are not clear whether "reason to believe" is an objective standard, or a subjective, defendant-specific standard. While the United States respectfully submits that the Court should treat it as an objective standard, even if the Court considers the

5

clearly on notice that Burton would be using the gun in criminal activity. Burton made statements and behaved in ways, which taken together objectively evidenced Burton's intent to use the firearm in criminal activity. Specifically, Burton made three statements that showed his exceptional concern that the police would be trying to trace the firearm: he told the defendant to use a false address when purchasing the firearm; he told the defendant that he was trying to file the serial number off of the firearm; and he told the defendant to report the firearm as stolen. And while Burton told the defendant that he wanted the gun for protection from people on the east side, he also told the defendant that he would pick the gun up when he was getting ready to go over to the east side, strongly suggesting that Burton was in fact seeking a confrontation (during which at least he would be armed), rather than merely trying to protect himself.[2] Additionally, when the defendant returned to pick up the firearm from Badger, Burton refused to enter the gun store with the defendant, and also asked the defendant to pick up extra magazines. The defendant himself has acknowledged that he had a bad feeling about lying on the form because he had a "gut feeling" that something bad was going to happen. The defendant even refused to buy the extra magazines Burton requested because he had a "bad feeling." All of these facts show unequivocally that *this* defendant knew that Burton was already planning on using the gun in criminal activity. The defendant nonetheless bought the gun, gave it to Burton, and never did anything to report Burton's possession of it. *See United States v. Charles,* 238 F.3d 916, 919 (7th Cir. 2001) (applying four point enhancement where defendant had "at least reason to believe" it would be used in a felony); *United States v. Rogers*, 46 F.3d 31, 33 (7th

_____

matter in light of the defendant's personal capacity, there is substantial evidence that this defendant had reason to believe Burton was going to use the firearm in criminal activity.

[2] As the defendant knew, Burton lived on the south side.

6

Cir. 1995) (same). Accordingly, the four level enhancement under § 2K2.1(b)(6) is appropriate.

With a deduction of three points for acceptance of responsibility under § 3E.1.1, this results in a total offense level of 15. The defendant is in criminal history category I. As a result, the advisory sentencing guideline range calls for a period of incarceration between 18 and 24 months. But obviously this is only the starting point for the Court's analysis.

## SECTION 3553(a) FACTORS

The Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a) in order to fashion a reasonable and appropriate sentence. *United States v. Walker*, 447 F.3d 999, 1006 (7th Cir. 2006). It is well-established that "[s]entences that are outside the guidelines range are reasonable if they conform to the sentencing factors in 18 U.S.C. § 3553(a)." *United States v. Gooden*, 564 F.3d 887, 890-91 (7th Cir. 2009) (citing *United States v. Simmons*, 485 F.3d 951, 953 (7th Cir. 2007)). If the Court is persuaded to impose an above-guidelines sentence, such a sentence should be supported "with 'compelling justifications.'" *Id.* (quoting *United States v. Gordon*, 513 F.3d 659, 666 (7th Cir. 2008)).

The United States respectfully asks the Court to give substantial weight to three of the 3553(a) factors: the nature and circumstances of the offense; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and, most significantly, to afford adequate deterrence to criminal conduct. *See United States v. Beier*, 490 F.3d 572, 574 (7th Cir. 2007) (Section 3553(a) does not attach weight to its factors, "thus leaving the sentencing judge with enormous latitude, reinforced by the vagueness of some of the factors" in assigning relative weight to each factor). In viewing these three factors, it is clear that the current advisory guidelines range cannot possibly reflect the seriousness of the

offense conduct, and is unlikely to provide an adequate general deterrent effect. Thus, a greater sentence is plainly appropriate.

> *The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense*

There is no doubt that the offense conduct in this case is exceptionally serious. Firearms-related violence is a significant problem in the City of Milwaukee, one that has taken a staggering toll in terms of human lives and suffering. All of this violence obviously begins with the perpetrators acquiring firearms. In the first six months of 2009, there were 39 firearms related homicides as well as 195 non-fatal shootings. *See* Milwaukee Homicide Review Commission, Homicides and Non-Fatal Shootings: A Report on the First 6 Months of 2009 (available at http://www.city.milwaukee.gov/Homicide ReviewComm22506.htm). In 2008, the last year for which there is complete data, there were 71 homicides, 65% of which involved firearms. *See* Milwaukee Homicide Review Commission 2008 Data Report (available at http://www.city.milwaukee.gov/HomicideReviewComm22506.htm). An additional 448 people were shot, but survived their wounds thanks largely to superior emergency medical services. *Id.* Among the shooting victims between 2008 and 2009, are six Milwaukee Police Officers. As unacceptably high as these numbers are, they are actually lower than in years past. Between 1999 and 2008, for example, there were 900 murders committed in Milwaukee, with more than 75% of which were committed with a firearm. *Id.* These numbers, of course, do not count other criminal offenses involving firearms such as robberies, threats, and shots fired where no one is hit. What all these numbers add up to is a city where the core right of its citizens to live in their homes and on their streets without fear for their physical security is an uncertain right at best, particularly in the most

8

impoverished and disadvantaged neighborhoods where firearms-related violence is highest.

Obviously, in fashioning an appropriate sentence that will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, an essential question for the Court to answer is whether the defendant should also be held liable for what Burton did with the firearm defendant provided to him. The answer is yes. The United States respectfully submits that any defendant who unlawfully obtains and distributes a firearm should be held responsible for the reasonably foreseeable use of the firearm in committing a crime. The cases, both before and after *United States v. Booker*, 543 U.S. 220 (2005), support this conclusion. *See, e.g., United States v. Leeks*, 317 Fed. Appx. 891, 893 (11th Cir. 2008) (sentencing judge properly considered fact that illegally trafficked guns "had fallen into the hands of criminals and were used for purposes of criminal activity").

*United States v. Kitchen*, 87 Fed. Appx. 244 (3d Cir. 2004) is instructive. *See generally United States v. Castro-Juarez*, 425 F.3d 430, 434-36 (7th Cir. 2005) (post-*Booker*, courts may look at guidelines departure analysis "only by way of analogy" to aid the court's determination of a sentence's reasonableness). There, in circumstances far more attenuated than those presented here, the Court found that a defendant should be held liable for a shooting involving a firearm that the defendant unlawfully obtained and distributed.

Kitchen pled guilty to 19 counts of making false statements to a federally licensed firearms dealer, one count of unlawfully dealing in firearms, and two counts of transferring firearms to convicted felons. One of the guns transferred by Kitchen ended up being used in a "road rage shooting" thirteen months later. It was unclear how that shooter had come to possess the gun used, as Kitchen had not transferred it to the shooter. Nonetheless, the district court departed upward two

9

levels under § 5K2.2, and sentenced Kitchen to the top of the guidelines range.

The Eleventh Circuit upheld the district court's upward departure. In deciding whether the upward departure was appropriate, the Court found that § 2K2.1 only addresses "the *potential* for the criminal use of illegally sold firearms," but "does not account for the *actual* injury inflicted by such weapons." 87 Fed. Appx. at 246 (emphasis in the original). Because the District Court could not account for the significant physical injuries of the victim of the shooting using § 2K2.1 alone, the upward departure was appropriate. *Id.* at 247. The Court also swept aside Kitchen's argument that there must be a "legal nexus" between his conduct and the injury to the victim that served as the basis for the departure. The Court held that the injury need only be "'knowingly risked,' as opposed to intended.'" And the Court had no trouble finding that "[b]y engaging in the offense of conviction, Kitchen knowingly created and deliberately disregarded the risk that one or more firearms would be used to criminally injure another person." *Id.* (agreeing with the district court that "Kitchen's illegal sale of a firearm recklessly initiated 'the chain of circumstances that resulted in injury" to the shooting victim); *see also United States v. Ratliff*, 1995 WL 299030 (6th Cir. 1995) (shooting of State Trooper by individual using firearm unlawfully sold by defendant properly considered part of defendant's relevant conduct).

The Seventh Circuit has endorsed similar reasoning, albeit not in a firearms case. In *United States v. White*, 979 F.2d 539 (7th Cir. 1992), White was convicted of transporting a minor in interstate commerce for purposes of prostitution. White eventually brought the minor to Milwaukee where she was picked up by a client and later found murdered. In sentencing White, Judge Evans departed upward from the guidelines sentencing range and imposed the statutory maximum term of imprisonment. *Id.* at 541. Judge Evans stated that the upward departure was justified not because

10

White "murdered this young woman," but because White "put into motion a scenario that had the inevitable tragic result that this one did." *Id.* at 544. In other words, White's actions in prostituting the troubled young woman made it "foreseeable that she could end up like she did" and her death under the circumstances was thus "not an unexpected event." *Id.* at 545.

The Seventh Circuit affirmed Judge Evans' sentence. The Court rejected White's claim that the minor's death was not a reasonably foreseeable outcome of the crime of conviction, and that a departure was only justified where the criminal act itself directly causes the death. *Id.* The Court instead held that an upward departure (under § 5K2.1) was justified if it was supported by a finding that "death was intentionally or knowingly risked." *Id.*; *see also United States v. Diaz*, 285 F.3d 92, 101 (1st Cir. 2002) (affirming upward departure where "defendant puts into motion a chain of events that risks serious injury or death, even when the intent to harm is entirely absent and the defendant was not directly responsible for the death."); *United States v. Ihegworo*, 959 F.2d 26, 29-30 (5th Cir. 1992) (affirming upward departure for defendant convicted of distribution of heroin based upon the accidental overdose of one of his customers because defendant reasonably foresaw death of serious bodily injury resulting from the heroin distributed).

Therefore, where a defendant like Collins unlawfully obtains and transfers a firearm to someone, it is plainly a reasonably foreseeable consequence that someone else – including police officers – could be shot and seriously injured or killed. In other words, as in *White*, this defendant "knowingly risked" that Burton would shoot someone in course of his criminal activity, and by unlawfully obtaining the firearm and giving it to Burton, "put into motion a scenario that had the inevitable tragic result that this one did." *White*, 979 F.2d at 544. Accordingly, the United States respectfully submits, this Court's must consider the shooting of Officers Kunisch and Norberg as

11

part of the defendant's offense conduct in fashioning a reasonable and appropriate sentence.

The United States submits that in fashioning such a sentence, the Court should look to the § 2K2.1(c), which directs the Court to look to the resulting offense conduct. *See White*, 979 F.2d at 544 (using the guidelines for voluntary manslaughter and second degree murder in fashioning an appropriate sentence in an interstate transportation of a minor for prostitution purposes where minor was subsequently murdered). Here, the resulting offense was Attempted Murder. Under § 2A2.1(a)(1), the base offense level for attempted murder where the object of the offense would have constituted first degree murder is 33. There can be no question that Burton's deliberate shooting of both officers in the head would have constituted first degree murder had the officers not been saved by the doctors at Froedtert Hospital. Indeed, the State has charged Burton with two counts of Attempted First Degree Intentional Homicide. *See State v. Burton*, Milwaukee County Circuit Court Case No. 2009CF002823. Assuming a four level enhancement because both officers sustained permanent and life-threatening bodily injuries under § 2A2.1(b)(1)(A), and a three level reduction for acceptance of responsibility, the resulting advisory guidelines sentencing range would be 151-188 months, as to each attempted murder. That would result in a sentencing range with a low end of 302 months. A statutory maximum sentence of 120 months would be less than 40% of this low end, would plainly be reasonable and appropriate in the circumstances.[3]

_____

[3] Under pre-*Booker* guidelines regime, §§ 5K2.0, 5K2.2, 5K2.6, 5K2.7, and 5K2.8 would all support a significant upward departure in cases such as this one which fall outside the heartland of the guidelines. The fact that the old guidelines regime supports such an upward departure helps demonstrate that such an upward departure is reasonable under the post-*Booker* system.

12

*The Overwhelming Need for the Sentence Imposed to Provide Adequate General Detergence Against the Unlawful Distribution of Firearms*

The need for general deterrence of *all* unlawful transfers of firearms is exceptionally high. It is literally a matter of life and death. Given the prevalence of firearms-related violence in Milwaukee and across the nation, the deterrence of the unlawful distribution of firearms is a paramount concern of the criminal justice system and a critical component of a reasonable sentence. *See United States v. Politano*, 522 F.3d 69 (1st Cir. 2008). While data on shootings and firearms-related homicides is readily available, data on the number of firearms distributed in Milwaukee is sketchy at best, however. This is so because firearms are not always recovered, and therefore cannot be traced. Moreover, because of evidentiary difficulties, law enforcement cannot always easily determine the path of a firearm from purchase to ultimate use in a crime. For example, it is not uncommon for firearms to be reported stolen. Some of these reports are false and designed to provide cover for an unlawful transfer of the firearm. Unfortunately, law enforcement cannot always separate the genuine from the fabricated reports, and hence must rely heavily on confessions, which are not always forthcoming.

The fact that unlawful transfers are difficult to detect – and then generally only detectable ex post facto – makes it is all the more critical that punishment be sufficiently certain to provide adequate deterrence to the general public. There can be no doubt that firearms are regularly being purchased from lawful firearms stores for future use in criminal activity. *See, e.g.*, John Diedrich, *Concealed Carry Pitched As Part of Gun Law Reform*, MILWAUKEE JOURNAL SENTINEL, October 14, 2009 (available at http://www.jsonline.com/news/ milwaukee/64262272.html) (reporting that "Badger [Guns] and its predecessor, Badger Outdoors, have accounted for about a third of all

13

crime guns recovered by Milwaukee police for several years. Guns from the store were used to shoot each of the six Milwaukee police officers wounded in the past two years."). But if there is only a low risk of detection, and if it is unlikely that offenders will face significant incarceration even if they are caught, there will be little to deter future potential offenders from seeking to profit through unlawful purchases and transfers of firearms. Thus, to actually deter future offenders the quantum of punishment must be very high. And in cases such as this one where a firearms purchaser is actually on notice that the individual to whom he gives the firearm intends to use that firearm in criminal activity, the potential punishment must be as high as possible. Anything less than a substantial period of incarceration will not adequately serve the critical need for general deterrence.

It also should be noted that the specific class of offenders to which the defendant belongs – straw buyers – is uniquely susceptible to deterrence. This is so because to purchase a firearm from a federally licensed dealer, one must be an adult without a felony conviction or other disqualifying condition (drug use, domestic violence misdemeanor, and so forth).[4] Thus, the universe of potential straw purchasers largely consists of law-abiding adults, who overwhelmingly conform their conduct to the requirements of the law. It is reasonable to conclude that such people are more likely to respond to a strong deterrent message than other classes of potential (or actual) criminals.

Finally, this case, because of all of the attendant publicity, presents a unique vehicle to get a deterrent message out to the entire community. Unlike the vast majority of sentencings which take place in this courthouse, the people of this city will be paying close attention to this one. The Court

---

[4] The United States submits that the history and characteristics of the defendant be given substantially less weight than it might ordinarily be accorded precisely because firearms trafficking offenses such as this one must, of necessity, always involve defendants who have no felony convictions. Thus, the fact that this defendant has very limited contacts with the law is of limited utility in fashioning an appropriate sentence with the maximum deterrent effect.

14

thus has an opportunity to send a message that will resonate and deter potential offenders long after the defendant is sentenced. The United States respectfully request that this Court send an unequivocal message of *absolute intolerance* for the unlawful distribution of firearms.

## **CONCLUSION**

For all these reasons, and any that may be stated at a the hearing on this matter, the United States respectfully requests that the Court impose a combined sentence of 120 months' imprisonment. Plainly, society cannot tolerate unlawfully obtained firearms being used to shoot police officers. Such a crime cries out for the maximum available punishment.

And if any good is to ever come from the tragic train of events set in motion by Jacob Collins, it can only be that future offenders will be deterred from committing such offenses in the first place.

Dated at Milwaukee, Wisconsin this 24th day of December, 2009.

Respectfully submitted,

MICHELLE L. JACOBS
United States Attorney

By:    /s/ John J. Manning

JOHN J. MANNING
Assistant United States Attorney
United States Courthouse
517 E. Wisconsin Ave., No. 530
Milwaukee, WI  53202
(414) 297-1700
(414) 297-1738 (Fax)
E-mail: john.manning@usdoj.gov

15