# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

       Plaintiff,

    *v.*                                 Case No. 09-CR-155 (LA)

JACOB D. COLLINS,

       Defendant.

---

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Jacob Collins, through counsel, submits the following memorandum to assist the Court in its imposition in the above-captioned case of a sentence sufficient, but not greater than necessary, to serve the goals of federal sentencing.

## <u>Introduction</u>

Particularly in a court known for its thoughtful, rather than mechanistic, approach to sentencing, this relatively high-profile case presents a challenge in light of the uniquely divergent views of the parties regarding the sentence that should be imposed against the defendant. The noted divergence takes two forms, one minor and one dramatic.

The minor divergence is found in relation to the application of the advisory sentencing guidelines. The presentence report, embraced by the Government, proposes that Collins' guideline range should be 18 to 24 months while Collins asserts that it should be 10 to 16 months.[1] The point of contention is the applicability of Section 2K2.1(b)(6): the presentence report and the Government propose its applicability; Collins argues its inapplicability.

The dramatic divergence exists beyond the advisory guidelines. In its Memorandum in Aid of Sentencing, the Government takes the position that Collins should be sentenced to the maximum term of imprisonment authorized by statute.[2] Here, Collins states that, regardless of the applicable guideline range, a sentence of probation constitutes "a sentence sufficient, but not greater than necessary" to serve the goals of federal sentencing.[3] 18 U.S.C. § 3553(a).

---

[1]    Collins' written objections to the presentence report, submitted directly to the report's author, challenge the report's application of Section 2K2.1(b)(6). As of the date of this filing, no addendum to the report is available and so it is assumed that the United States Probation Office continues to recommend the challenged enhancement.

[2]    The specific sentence recommended by the Government is somewhat unclear. According to the Government, Collins' conduct "cries out for the *maximum available punishment.*" Gov't Sentencing Memo at 15 (emphasis added). Because Collins pleaded guilty to two offenses for which the "maximum available punishment" applicable to each is a 10-year term of imprisonment, he can be imprisoned for up to 20 years. *See* PSR at ¶ 70. But, ultimately, the Government seeks "a combined sentence of 120 months." Gov't Sentencing Memo at 15. Regardless whether the Government seeks the actual "maximum available punishment" or a sentence of 10 years, Collins' position is the same: any sentence remotely resembling that proposed by the Government is profoundly "greater than necessary" to serve the goals of federal sentencing. *See* 18 U.S.C. § 3553(a).

[3]    As of the date of Collins' sentencing hearing, he will by that time have served approximately one month in jail and six months on electronically-monitored home detention.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

This Court's resolution of the described divergences, it is suggested here, turns upon its contemplation of a single fundamental question: is it just to punish one man for another's sin? More to the point, should a young and developmentally-disabled man who committed crimes that, viewed intrinsically, are relatively routine be punished in an otherwise unheard of manner on the basis of some other person committing far worse offenses that the young man never intended to occur? The answer, it is submitted, is no. The Government's principled but opportunistic message-sending sentencing position threatens only to expand the victimization resulting from the alleged actions of Julius Burton by adding Collins and his loved ones to the list of those sustaining life-altering harm from Burton's actions.

<u>Discussion</u>

I.    **Given The Inapplicability of Section 2K2.1(b)(6), Collins' Advisory Guideline Sentencing Range Should be 10 to 16 Months.**

To the extent a defendant convicted of a firearms offense "possessed or transferred any firearm . . . with knowledge, intent, *or reason to believe* that it would be used or possessed in connection with another felony offense," the defendant's advisory guideline offense level is to be increased by four. U.S.S.G. § 2K2.1(b)(6)(emphasis added). In this instance, both the presentence report and the Government contend that "Collins should have reasonably known the firearm would have been used in connection with another felony offense." PSR at ¶ 28; *see also* Gov't Sentencing Memo at 5-7.

FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

Toward that end, the presentence report and the Government rely on three circumstances: (1) that Collins indicated that Burton directed him to use a false address when purchasing the relevant firearm; (2) that Burton "later informed" Collins that he (Burton) would be filing off the gun's serial number; and (3) that Burton "later" asked Collins to report the gun stolen. *See* PSR at ¶ 28; *see also* Gov't Sentencing Memo at 6. For its part, the Government offers two additional circumstances as supporting the enhancement: (1) that Burton's stated fear of persons on Milwaukee's eastside combined with his subsequent retrieval of the firearm in preparation for his stated intention of going to the eastside "strongly suggest[ed]" his pursuit of an armed confrontation; and (2) that Collins, during his performance of the illegal transaction, had a "bad" or "gut feeling" that something bad would result from his participation in the purchase of a gun for Burton. *See* Gov't Sentencing Memo at 6.

Neither individually nor collectively do these circumstances, placed in their proper context, establish that Collins should therefore have believed that Burton would put the firearm to felonious use. This is especially true once Collins' limited ability to process information is entered into the relevant equation.

**A.** ***The Cited Circumstances Fail to Establish That Collins Should Have Believed That Burton Would Put The Firearm to Felonious Use.***

All involved seem to agree that Burton recruited Collins' assistance in acquiring a firearm by stating his need for defensive protection. *See* Gov't

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Sentencing Memo at 3 (stating that Collins agreed to purchase the gun only after Burton described having "been jumped by some people" who, "if they saw him again, . . . would shoot him" such that "he wanted the gun to protect himself").  On that basis, Collins wrongfully and, we now know, tragically agreed to involve himself in Burton's acquisition of a handgun.    In doing so, Collins contemporaneously "knew that . . . what he was doing was wrong."  Gov't Sentencing Memo at 4.

With those circumstances as the backdrop for Collins' purchase of the firearm, certain other circumstances lose a substantial degree of their suspicious steam.  For instance, when Burton is said to have counseled Collins to use a false address in completing the relevant paperwork, Collins, who knew he was doing something "wrong" by purchasing the gun for Burton, may well have received that advice  as a means of minimizing his chance of being apprehended in the event *his* wrong, rather than any unspecified future wrong in which Burton might engage, came to light (*i.e.,* "I'm lying on a gun form; it might not be a bad idea to make myself difficult to locate in case anyone figures out my lie").  The "bad" feeling in Collins' "gut" that something "bad" would happen may well have been similarly internally-directed: of course Collins, in conducting a transaction he knew to be wrong, would have a bad feeling in his gut about possible negative outcomes (*i.e.,* "Here I am committing a crime by lying on a gun form; this could really go wrong for me").  In

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

all of these regards, that told to and felt by Collins were more likely related to his sense of personal wrongdoing than to an ephemeral belief about Burton's future intentions.

Other circumstances – that Burton later spoke of attempting to obliterate the firearm's serial number and, at the same time, asked Collins to report the gun as stolen – have no place in the relevant inquiry. As above, the plain language of Section 2K2.1(b)(6) ties the defendant's requisite knowledge or belief to his possession and/or transfer of the relevant firearm. *See* U.S.S.G. § 2K2.1(b)(6). Thus, the inquiry is what the defendant knew and/or believed at the time he possessed and/or transferred the gun. *See id*. It is clear that Collins' possession of the relevant firearm had concluded, and the transfer of the gun to Burton had occurred, "a few weeks" before Burton is said to have spoken about obliterating serial numbers and reporting the gun as stolen. *See* Gov't Sentencing Memo at 5. In other words, Burton's troubling statements "a few weeks" after Collins "possessed" and "transferred" the firearm have no bearing on the Section 2K2.1(b)(6) inquiry regarding what he knew and/or believed while possessing and transferring the gun.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**B.** *The Inquiry Regarding That Which Collins' Had "Reason to Believe" Should Include Consideration of His Limited Ability to Process Information.*

Attached to this memorandum as Exhibit One is a report of a psychological evaluation of Collins conducted by Sheryl Dolezal, Psy.D.[4]  As indicated by her report, Dr. Dolezal performed a battery of tests upon Collins and, as a result, offers a diagnosis.  The diagnosis, according to Dr. Dolezal, "means that cognitively [Collins] will have difficulty comprehending information and reasoning abstractly."  The doctor nicely illustrates the scenario:

> "[W]hen a situation necessitates that [Collins] process information and is required to draw conclusions or formulate hypotheses he will have significant difficulty. Instead, [Collins] is a very straightforward thinker meaning A+B = A+B rather than being able to develop alternate conclusions. [Collins] is also not able to employ critical thinking or reasoning skills.  He processes information and operates on a very basic level."

So in evaluating, as the Court is being called upon to do, that which Collins had "reason to believe," the inquiry is not how a federal judge, a federal prosecutor, or a federal probation officer would have processed information and drawn inferences, therefrom.  It is how the various circumstances presented would appear to a person who, according to Dr. Dolezal, processes information like someone in the

---

[4]    While Dr. Dolezal's work in this case has been funded by the defense, the Court may be familiar with her on the basis of her work with this District's United States Probation Office in cases involving mental health issues.

7

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

early years of elementary school.[5] On that basis, Collins, a man clinically-diagnosed as limited in his ability to engage in abstract thinking, should not, as the Government suggests, be held responsible for hearing Burton state his intention of going to the eastside and interpreting that to mean that Burton's intentions with the firearm might be offensive rather than, as previously stated to Collins by Burton, defensive.[6]

For all of these reasons, Collins asks this Court to find Section 2K2.1(b)(6) inapplicable on the facts and circumstances of this case and to therefore deem his total offense level as being 12.[7] That, combined with his Category I criminal history, produces an advisory guideline sentencing range of 10 to 16 months.

---

[5]     The Government, in its sentencing memorandum, describes Section 2K2.1(b)(6) as being unclear "whether 'reason to believe' is an objective standard, or a subjective, defendant-specific standard" and asks the Court to "treat it as an objective standard."  Gov't Sentencing Memo at 5 (n.1).  The Government is incorrect: the guideline itself, by its express reference to "the defendant" as opposed to a "reasonable person" or similarly objective identifier, strongly suggests that a court is to evaluate what "the defendant" had "reason to believe" on the specific defendant's own terms.

[6]     As above, Dr. Dolezal's "A+B = A+B" illustration is useful.  When Burton said "I am going to the eastside" and "I am coming to get my gun" (*i.e.*, "A+B"), Collins' diagnosis and its actual impact upon his cognitive performance is such that he would process that information as nothing more than "I am going to the eastside and coming to get my gun."

[7]     The inapplicability of the relevant four-level enhancement makes only a three-level difference in Collins' final offense level because Section 3E1.1(b) no longer applies.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## II. Once All of The Factors Set Forth at Section 3553(a) Are Fully Considered, a Sentence of Probation is Defensible as "Sufficient, But Not Greater Than Necessary," to Serve The Goals of Federal Sentencing.

The Government is fairly unabashed in the message-sending purpose behind its fairly extraordinary approach to sentencing in this case. *See, e.g.,* Gov't Sentencing Memo at 14 ("this case, because of all of the attendant publicity, presents a unique vehicle to get a deterrent message out to the entire community"). While deterrence is certainly a legitimate goal of federal sentencing, *see* 18 U.S.C. § 3553(a)(2)(B), it is not the only goal. Beyond that obvious circumstance, the great weight that the Government implicitly places upon that factor in this case is dangerous: because deterrence is a statutory goal in every case and because deterrence is best served by lengthy sentences, one might expect that, if deterrence carries more weight than other factors, the rate of above-guideline sentences would be higher than 1.8 percent nationally.[8] *See* United States Sentencing Commission, *Preliminary Quarterly Data Report* at 1 (2009). For this reason and others, the Court is urged to ignore the Government's opportunistic invitation to use the "attendant publicity" of this case – publicity flowing from a crime that Collins did not commit – as a basis for exalting deterrence above the other goals of federal sentencing.

---

[8]     With respect to offenses, like Collins', to which Section 2K2.1 applies, 6,222 defendants were sentenced during the most recently-concluded fiscal year and, according to Sentencing Commission data, only 87 of those defendants (.01 percent) received a sentence above, to *any* degree, the applicable guideline range. *See* United States Sentencing Commission, *Preliminary Quarterly Data Report* at 15 (2009).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**A.** *Viewed in Its Proper Context And in Relation to This Country's Manner of Regulating Firearms, "The Nature And Circumstances of The Offense" in This Case Are Actually Mitigated in Comparison to The Typical Violation of Section 922(a)(6).*

Issue is taken with the Government's averment that "There is no doubt that the offense conduct in this case is exceptionally serious." Gov't Sentencing Memo at 8. While the use to which Julius Burton put the relevant firearm more than a month after Collins' crimes were complete was "exceptionally serious," Collins' conduct, viewed intrinsically, can actually be considered as mitigated in comparison to typical violations of Section 922(a)(6).[9]

The seemingly typical "straw purchase" of a firearm tends to result in the placement of the gun in the hands of someone prohibited by law from possessing one. In other words, Section 922(a)(6), as typically applied, targets more than just a false statement but, also, a false statement that results in a firearm arriving into the hands of someone who the law has deemed unfit to possess such a weapon. Collins' crime is different. Julius Burton was not, at the time Collins purchased a gun for, and transferred it to, him, prohibited from possessing a handgun: he was 18 years old at the time and did not apparently trigger any of the various Section 922(g)

---

[9]     It is acknowledged that Collins stands properly convicted of violating not only Section 922(a)(6) but also Section 922(g)(3). Especially because it is inarguable that Collins' possession of the firearm in violation of Section 922(g)(3) involved only that necessary to perfect the violation of Section 922(a)(6), his violation of Section 922(g)(3) is treated here as incidental.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

prohibitions.[10]  *See* 18 U.S.C. § 922(x)(prohibiting "juveniles" from possessing handguns but defining "juvenile" as under the age of 18).  In this regard, Collins' violation of Section 922(a)(6) involves only a lie, not a lie resulting in a prohibited person taking possession of a firearm.

That Collins' crime in this case is the lie, itself, and not the horrific backstory is further suggested by the reality that Collins could have put a handgun in Burton's hands without any "straw purchase" culpability. Had Collins walked into a gun store and purchased a firearm for himself before, only days later, finding himself short of cash, Collins could have lawfully sold the gun to Burton under the same atmospheric circumstances surrounding his unlawful "straw purchase." If Burton had then used the gun purchased from Collins to attempt the murder of two police officers, Collins would not have been subject to "straw purchase" prosecution, much less imprisonment.  Because Collins could have lawfully placed a firearm in Burton's hands, the illegality at issue here is that he did so by lying on the relevant form.  The

---

[10]        Despite being entitled to lawfully possess a handgun, Burton needed Collins' assistance only in order to acquire the handgun from a licensed dealer.  *See* 18 U.S.C. § 922(b)(1)(prohibiting licensed firearms dealers from selling handguns to persons under the age of 21).  This country's gun laws are mystifying.  Sections 922(x) and 922(b)(1), taken together, produce an absurd result by which 18, 19 and 20-year olds who, by law, are not even trusted with a can of beer have a right to possess handguns; to acquire one, however, the 18, 19 or 20-year old cannot do so via the official and documented channels of a licensed gun dealer.  Instead, a person too untrustworthy to drink a beer must either recruit a straw purchaser or otherwise acquire the handgun by informal and undocumented means (*i.e.*, buying one in a back alley). One would think that if we are to permit youngsters to possess handguns, we would take steps to ensure that the youngsters acquire them in a manner involving some degree of oversight.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:09-cr-00155-LA   Filed 12/31/09   Page 11 of 22   Document 24

relevant culpability, therefore, is the telling of the lie, not the transfer of the handgun and much less the use to which Burton later put the gun.

For all of these reasons and controversial as it may be to say, the "nature and circumstances" of Collins' offense – *i.e.*, making a false statement in order to place a firearm in the hands of someone legally entitled to possess one – are more *malum prohibitum* (an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law) than *malum in se* (an act that is inherently and essentially evil, that is, immoral in its nature). *See Black's Law Dictionary* 662 (6th ed. 1991).

**B.** ***The "History And Characteristics of The Defendant" Weigh Against His Being Sentenced in Extraordinary Fashion.***

On this prong of the Section 3553(a) analysis – a prong essentially ignored by the Government in its filing – Collins basically directs the Court's attention to the presentence report (particularly Paragraphs 46 through 62 which detail his social history) and to Dr. Dolezal's report. Together, the documents depict a child born into disadvantage and further challenged through adolescence and into adulthood by a diagnosed developmental disability. And the prognosis is poor: according to Dr. Dolezal, Collins is not really equipped for fully-independent living and is unlikely to obtain more than low-level employment.

Additionally, though, there are circumstances within this case that reflect well on Mr. Collins. These include:

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

- Even within the context of violating federal law, Collins demonstrated that he has boundaries. For instance, he declined Burton's invitation to purchase additional items, including extra magazines. *See* Gov't Sentencing Memo at 4. Additionally, he apparently refused when Burton suggested that he falsely report the gun as having been stolen. *See id.*

- In the immediate aftermath of the officers being shot and federal agents coming for him after tracing the relevant firearm's history, Collins cooperated entirely, a circumstance that continues through this date. In fact the bulk of the factual information set forth at Pages 3 through 5 of the Government's sentencing submission is derived from information provided by Collins in connection with his arrest in June.

- Those closest to Collins, including some who are largely responsible for his welfare, describe him fondly and the mother of his young child notes his efforts at being a good father to his daughter, Unique. *See* PSR at ¶¶ 49 through 53.

- Released on electronically-monitored home detention in early July, Collins has abided by his conditions of release, save for a single positive drug test suggestive of marijuana consumption, for the ensuing seven months.[11] *See* PSR at ¶ 61.

- Notwithstanding his lawyer's attempts at distancing Collins from the damage done by Burton, Collins has constantly taken emotional responsibility for his role in the chain of events that forever altered and nearly ended the lives of two public servants. Collins describes "hurting" since the day he learned that the officers had been shot, that he thinks about the officers every day, and that he is most upset that the officers were seriously injured and are unable to work. *See* PSR at ¶ 59. Consistent with his statements, Collins took the extraordinary step of, on his own, submitting to a televised interview in which he inculpated himself while sharing to the best of his ability the remorse he feels about the events of June 9.

---

[11] On this basis, a self-surrender will be requested in the event Mr. Collins is sentenced to serve a term of imprisonment. *See* 18 U.S.C. § 3143(a)(1)(stating that the standard for release pending execution of sentence is the same that Collins satisfied in order to maintain his release pending sentencing).

**C.** *A Sentence at The Statutory Maximum in This Case Does Not Promote "Respect For The Law" But, Rather, Threatens to Compromise That Ideal.*

Too often, it seems, the notion of promoting respect for the law is stated in terms of imposing sentences that, stated colloquially, demonstrate that the law means business. It sometimes seems that "respect for the law" is treated as "obedience to the law." This, it seems, is another form of message-sending that quickly blurs the distinction that presumably must exist between Sections 3553(a)(2)(A) and (a)(2)(B). Recognizing that promoting respect for the law exists as a separate goal from affording adequate deterrence, the former must mean something different from the latter and something other than the notion that imposing lengthy sentences will promote law-abiding behavior.

In this case, the Government's request for an extraordinary sentence threatens to diminish, rather than promote, respect for the law.

*First* and foremost, the notion that one man should be punished for another's sin is not one that we as a society generally embrace. To deviate in an opportunistic message-sending manner from the general philosophy of "if you do the crime, do the time [for the crime you did, not for somebody else's crime]," is counterproductive to promoting respect for the law.

*Second*, the Government's desire to have Collins sentenced to the maximum available punishment runs counter to the generally-accepted perspective that some

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

benefit flows to a defendant who, having committed a crime, handles himself responsibly once brought to answer for that wrong in a court of law. In this regard, it is interesting to note the sentencing exposure that Collins might have faced if he had behaved in a manner completely opposite to the responsible behavior he has exhibited since law enforcement first contacted him. Had he, upon learning that Burton shot the two officers, fled the jurisdiction; if he had been apprehended only upon leading the authorities on a high-speed vehicular chase; had he lied to officers interviewing him upon his apprehension; had he resisted extradition back to Milwaukee after being caught; if he had then attempted to intimidate witnesses; had he proceeded to trial; and had he perjured himself during the course of that trial, Collins' advisory guideline sentencing range would still be well beneath the sentence the Government is requesting in the face of his having more than accepted responsibility for his wrong. This approach is counterproductive to the systemic and social benefit that accompanies a consistent philosophy that wrongdoers who accept responsibility can expect some form of reward for doing so.

*Third*, inherent in the Government's sentencing position in this case is a valuation of humanity that may not be an appropriate role for the criminal justice system to perform. An approach by which all humans are created and treated as equals would seem to promote respect for the law. But if all involved in this case are courageous enough to be honest, the cited approach is not being employed in this

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

case. Does anyone believe that the Government would be seeking to have Collins sentenced in an extraordinary manner if Burton, after receiving the firearm from Collins, had attempted the murders of two drug dealers, rival gang members, or other forms of thug or ne'er-do-well ? If the answer, as suspected, is negative, two concerns germane to respect for the law arise.

1. **Valuing the Lives of Police Officers Over Regular Citizens Tends to Promote Existing Distrust of The Law in The Very Communities in Which The Government Seeks to Spread Its Message.**

Exalting police officers to a status above regular citizens may be sensible and is certainly embraced by a large segment of society. But in other segments of society, the cited exaltation, particularly when embraced by the criminal justice system, tends only to aggravate existing distrust of the system and its processes. The "unlawful distribution of firearms" that the Government seeks to deter tends to occur predominantly in those segments of society. *See* Gov't Sentencing Memo *at* 14-15. The resulting gun violence tends to occur within those segments of society and the belief there is that so long as the violence remains on one side of socioeconomic and demographic lines, the system is largely disinterested in addressing it. To now, as the Government seeks to do, take a keen interest in a violent crime that crossed various lines is to send an unintended message quite different from "absolute intolerance for the unlawful distribution of firearms." Instead, the unintended and unfortunate message becomes one of certain lives

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

having value and others being largely disposable.  Any such message has the effect of breeding disrespect for the law rather than promoting respect for it.

> **2.**   **Holding Collins Liable For Sentencing Purposes For The Pedigree of Burton's Victims Extends Theories of Liability Beyond All Recognized Boundaries.**

There exists a *Palsgraf*-ian aspect to the Government's position in this case.[12] While any theory of liability would tend to hold Collins responsible for harm caused by a firearm in his own hands, the Government asks the Court to hold Collins responsible for harm caused by a firearm in another's hands.  That, as addressed in detail above, is a scenario contemplated in certain circumstances by the United States Sentencing Commission by way of Section 2K2.1(b)(6).  An interesting aspect of the Sentencing Commission's approach to the issue of liability for harm caused by a firearm in another's hands is that the Commission chose to take a one-size-fits-all approach: the penalty for this form of liability is a four-level increase regardless of the nature, details, and circumstances of the felony committed by some other person.

Obviously dissatisfied with the Commission's approach to this expanded form of sentencing liability, the Government seeks a sentence more than 200 percent greater than the Commission has contemplated as appropriate even if Collins is

---

[12]    *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928), is, of course, the historic case studied by generations of law students on the issue of causation in connection with civil liability.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

deemed to have Section 2K2.1(b)(6) responsibility for Burton's acts. As above, the reason seems clear: it is because Burton attempted the murders of not just two people but, instead, of two police officers.

It is at this point and on this basis that the Government's somewhat *Palsgraf*-ian approach falls entirely apart. If we are, as the Government proposes, to dramatically increase Collins' punishment on the basis of Burton's victims' pedigree, doing so punishes Collins for a circumstance he did not intend and, quite frankly, never would have conceived of. While an argument can be made that circumstances were such that Collins might have had reason to believe that Burton had some felonious intention, he only would have been on circumstantial notice that Burton might shoot someone with whom he was beefing on the eastside. In the words of Chief Justice Cardozo in *Palsgraf*, to heap extra punishment upon Collins on the basis that Burton's victims were police officers is to punish him for a hazard entirely unapparent to him.[13] This is not how the criminal law is intended to work and to opportunistically deviate from time-honored convention in this case tends not to promote respect for the law.

---

[13] One has to even doubt that Burton, at the time he took possession of the gun purchased by Collins, envisioned himself attempting the murder of the two officers.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**D.** *Available Data Suggests That Imposition of Even a Within-Guideline Sentence Tends to Create "Unwarranted Sentencing Disparity."*

On the theory that, as above, Collins' crime is the lie giving rise to the violation of Section 922(a)(6), data available to Federal Defender Services of Wisconsin (FDSW) establishes that imposition of even a within-guideline sentence, much less anything resembling the extraordinary sentence requested by the Government, tends to generate unwarranted sentencing disparity. Since its inception, FDSW has represented 12 defendants convicted and sentenced in the Eastern District of Wisconsin for violations of Section 922(a)(6). The outcomes of those 12 cases are as follows:

| Defendant/Case # | Sentence | Additional Information |
|---|---|---|
| Anthony Dudley, 01-CR-157 | 15 months CAG | Unknown |
| Quatrina Johnson, 02-CR-257 | 3 years probation | n/a |
| Elizabeth Vargas, 03-CR-160 | 3 years probation | Count of conviction alleged violation of Section 922(q)(2)(A) |
| Darnell Burrell, 04-CR-138 | 8 months CAG | n/a |
| Thomas Sankey, 05-CR-47 | 2 years probation | n/a |
| Anthony Bass, 05-CR-116 | 10 months CAG | n/a |

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:09-cr-00155-LA   Filed 12/31/09   Page 19 of 22   Document 24

| Defendant/Case # | Sentence | Additional Information |
|---|---|---|
| Robert Marlow, 06-CR-58 | 3 years probation | n/a |
| Howard Oliver, 06-CR-183 | 3 years probation | n/a |
| Joshua Peterson, O7-CR-93 | 18 months CAG | Defendant was a prohibited person pursuant to Section 922(g)(9) |
| Kellie Bowie, 08-CR-282 | 6 months CAG | Relevant conduct included multiple "straw purchases" |
| Tabitha Lynch, 08-CR-285 | 5 months | Defendant revoked for violations on release pending sentencing |
| Kizzie Lesure, 08-CR-284 | Time-served in state case | State case involved party to reckless injury while armed with relevant firearm |

## Conclusion

That which occurred on a Milwaukee street during the afternoon of June 9 was and remains horrific. As the consequences that Jacob Collins should suffer for his role in the chain of events ending in that horror are contemplated, it seems appropriate to also contemplate the various other actors in the chain of events that placed a handgun in the hands of Julius Burton. There is, of course, Badger Guns which, according to the version of events provided by the Government, allowed two young men to suspiciously browse its handguns before an employee seemingly turned a blind eye as the young man incapable of even perfecting the necessary

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

paperwork purchased one. There are the firearms manufacturers and distributors that continue to sell their deadly wares to Badger Guns despite that business' apparent reputation for selling guns that find their way into the hands of criminals. There is the Bureau of Alcohol, Tobacco and Firearms which appears toothless with respect to its ability to meaningfully enforce the federal license held by Badger Guns. And there are the lobbyists and legislators who perpetuate insane circumstances such as the one, discussed above, in which youngsters not yet trustworthy enough in the eyes of the law to consume alcohol are free, pursuant to federal law, to possess this society's most frequently-employed instrument of death. All of these actors played some part in the chain of events that left two police officers gravely wounded on a Milwaukee street and yet now only developmentally-disabled Jacob Collins, by virtue of his having told a half-botched lie on an ATF form and having done so while hoping to earn forty bucks while helping a friend, is alone facing the consequences of that which transpired.

Jacob Collins told a lie. The telling of the lie was a crime. Jacob Collins should be punished for that illegal lie but only for that illegal lie.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Dated at Milwaukee, Wisconsin, December 31, 2009.

Respectfully submitted,

**/s/ Daniel W. Stiller**

Daniel W. Stiller
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
517 E. Wisconsin Avenue, Room 182
Milwaukee, WI 53202
Tel: 414-221-9900
Fax: 414-221-9901
E-mail: daniel_stiller@fd.org

Counsel for Jacob Collins