# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

    v.                                      Case No. 09-CR-155

**JACOB COLLINS**
       **Defendant.**

## SENTENCING MEMORANDUM

In May of 2009, a man named Julius Burton approached defendant Jacob Collins, a friend of his, and asked defendant to buy him a gun. Burton said he needed the gun for protection from people who were trying to hurt him, but at age eighteen he could not buy a handgun from a licensed firearm dealer himself. Defendant, then age twenty-one and thus old enough to do so, see 18 U.S.C. § 922(b)(1), agreed, in exchange for a payment of $40. The two men went to Badger Guns, Burton picked out the gun he wanted, and defendant bought it with $420 Burton previously gave him.

In filling out the ATF form associated with the sale, defendant made several false statements. First, in response to the question, "Are you the actual buyer/transferee of the firearm listed on this form?", defendant initially checked "no" but then checked "yes" and wrote his initials above the box marked "no." The form specifically states that a person cannot buy a gun on behalf of another. Second, defendant listed an old address as his current address. He later explained that Burton told him to list a false address in case the police came looking for him. Third, in response to the question whether he was a user of marijuana or others drugs, he falsely stated "no." Defendant's admitted use of marijuana during this time period made his

possession of a firearm unlawful under 18 U.S.C. § 922(g)(3).

Two days later, Burton and his cousin drove defendant back to Badger Guns, but this time Burton did not enter the store with defendant. Burton asked defendant to purchase ammunition in exchange for an extra $20, and defendant agreed, but he declined Burton's further request to buy extra magazines because he "had a bad feeling." Defendant entered the store alone, reviewed the ATF form, signed it, and picked up the gun. Defendant then left the store, met Burton in the parking lot, and the two rode the bus back to defendant's home. Once there, Burton paid defendant a total of $60 and asked defendant to hold the gun. Two days later, Burton picked up the gun.

Burton spoke to defendant again a few weeks later, advising that he fired the gun while at his mother's home, and that he tried to scrape off the serial number. He also asked defendant to report the gun as stolen, but defendant never did.

On June 9, 2009, Burton shot and seriously injured two City of Milwaukee police officers after they stopped him for riding his bicycle on the sidewalk.[1] Police arrested Burton and seized the firearm. Officers traced the gun to defendant, and he promptly admitted his acquisition of the weapon in a <u>Mirandized</u> statement. Charged with making false statements on the ATF form, contrary to 18 U.S.C. § 922(a)(6), and possessing a firearm as a drug user, contrary to 18 U.S.C. § 922(g)(3), he pleaded guilty to the indictment without any agreement with the government.

---

[1]Burton awaited trial in state court related to the shootings at the time I sentenced defendant in this case. However, the parties agreed that for purposes of this proceeding I could accept that Burton shot the officers with the gun defendant provided.

2

The case presented serious challenges in fashioning a fair and just sentence. The government, stressing the serious injuries to the officers, the problem of gun violence, and the need to deter straw purchasers, requested the maximum statutory sentence – 10 years' imprisonment. Defendant, stressing his lack of knowledge that Burton planned any harm with the gun, much less the shooting of two police officers, his limited mental capacity, and his lack of any prior criminal record, requested a sentence of probation.

After hearing the arguments of the lawyers, the statements of the officers,[2] and the allocution of the defendant, I imposed a sentence of 24 months' imprisonment. This memorandum sets forth the reasons. I first explain my calculation of the advisory sentencing guideline range, then my evaluation of the statutory sentencing factors. See United States v. Bush, 523 F.3d 727, 729 (7th Cir. 2008) (stating that to determine a defendant's sentence the district court must first calculate and consider the sentence recommended by the advisory sentencing guidelines, then to ascertain the actual sentence it must apply the criteria set forth in 18 U.S.C. § 3553(a) to the facts and circumstances of the particular case).

**I. GUIDELINES**

The pre-sentence report ("PSR") set a base offense level of 14 under U.S.S.G. § 2K2.1(a)(6) because defendant was, at the time of the offenses, a "prohibited person" due to his drug use. The PSR then recommended a 4-level enhancement under § 2K2.1(b)(6), which

---

[2]Defendant objected to consideration of the officers' statements, arguing that they did not qualify as "crime victims" under 18 U.S.C. § 3771(e). I concluded that even if the officers did not technically meet this statutory definition, which would require me to consider their statements Fed. R. Crim. P. 32(i)(4)(B), I possessed discretion to consider this information under 18 U.S.C. § 3661. See United States v. Duffy, 315 Fed. Appx. 216, 219 n.4 (11th Cir. 2009); see also United States v. Atlantic States Cast Iron Pipe Co., 612 F. Supp. 2d 453, 495-97 (D.N.J. 2009).

3

applies if "the defendant . . . transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." Defendant objected to the enhancement, arguing that he lacked the requisite knowledge, intent or belief.

The government bears the burden of proving, by a preponderance of the evidence, that this enhancement should apply. United States v. Wagner, 467 F.3d 1085, 1089 (7th Cir. 2006). The government need not prove that the defendant knew or had reason to believe that the gun would be used in a specific felony offense, or that the defendant harbored any notion as to precisely how or when the gun would be used in connection with the other felony offense. See United States v. Scott, 503 F. Supp. 2d 1097, 1100 (E.D. Wis. 2007) (citing United States v. Inglese, 282 F.3d 528, 539 (7th Cir. 2002); United States v. Jemison, 237 F.3d 911, 918 (7th Cir. 2001); United States v. Messino, 55 F.3d 1241, 1256 (7th Cir.1995)); see also United States v. Cutler, 36 F.3d 406, 408 (4th Cir. 1994) (stating that the guideline does not require the defendant have knowledge of the specific offense to be committed). The Seventh Circuit has assumed, without deciding, that the standard is subjective, that is, the phrase "reason to believe" refers to "something of which the defendant is conscious, rather than, as in the tort law of negligence, something of which a reasonable person would be conscious whether or not this person, who may have a defective understanding, is conscious of it." United States v. Gilmore, 60 F.3d 392, 394 (7th Cir. 1995). Other courts share this assumption. See id. (citing United States v. Pantelakis, 58 F.3d 567 (10th Cir. 1995); Cutler, 36 F.3d at 408; United States v. Brewster, 1 F.3d 51 (1st Cir. 1993)); see also United States v. Caldwell, 448 F.3d 287, 292-93 (5th Cir. 2006) (considering the defendant's claim that the enhancement should not apply based on his youth and naivete, but rejecting it on the merits). Finally, consistent with the plain

4

language of the guideline, the focus of the inquiry should be on the defendant's state of mind at the time of the transfer. See Scott, 503 F. Supp. 2d at 1101.

The PSR recommended the enhancement in this case based on defendant's transfer of the firearm to Burton. The report relied on the following facts in support: (1) Burton told defendant to list a false address on the ATF form when purchasing the gun; and (2) Burton later told defendant that he would be filing off the serial number and asked defendant to report the gun as stolen. The PSR concluded that given these circumstances defendant should have reasonably known that the firearm would be used in connection with another felony offense. (PSR ¶ 28.)

The government elaborated on the PSR's recommendation, indicating that Burton made statements and behaved in ways, which taken together objectively, evidenced Burton's intent to use the firearm in criminal activity. Specifically, the government pointed to three of Burton's statements expressing his concern that the police would be trying to trace the firearm: (1) he told defendant to use a false address when purchasing the gun; (2) he told defendant he was trying to file off the serial number; and (3) he told defendant to report the gun as stolen. The government further noted that "Burton told Collins that he had been jumped by some people on the east side and that these people told Burton that if they saw him again, they would shoot him. Burton said he wanted the gun to protect himself." (Govt.'s Mem. in Aid of Sentencing [R. 22] at 3.) After defendant obtained the gun, "Burton asked [defendant] to hold onto the gun for him for a few days. Burton said he was going home and was not going over to the east side. Burton said that when he was going over to the east side he would come and get the gun. Two days later, he returned to [defendant's] home and picked up the gun and ammunition." (Id. at 4-5.) The government argued that these facts tended to show that Burton

5

was in fact seeking a confrontation rather than merely trying to protect himself. The government also noted that when they returned to pick up the gun Burton refused to enter the store and asked defendant to pick up extra magazines (which defendant declined to do). Finally, the government noted defendant's post-arrest statement to police that he had a "gut feeling" something bad was going to happen, and that he refused to buy the extra magazines because he had a "bad feeling."[3]

Although the issue was a fairly close one, I could not, based on the limited evidence, draw the inferences the government suggested. I first noted that some of the evidence upon which the government relied, namely Burton's statements about filing off the serial number and his request that defendant report the gun stolen, post-dated the transfer; as indicated above, the guideline focuses on the defendant's state of mind at the time of the transfer.[4] At the time of the transfer in this case, defendant knew that Burton wanted a gun for protection from unidentified people, and that Burton wanted him to list a false address on the ATF form. Defendant listed the false address and made two other false statements – about him being the actual purchaser and about his drug use – on the form. The most reasonable inference to

---

[3]At the sentencing hearing the government made further statements about Burton, i.e. that he had a "beef" with people on the east side with whom he was going to "shoot it up." As I noted during the hearing, the record contained absolutely no evidence that Burton ever made such statements or expressed an intent to "shoot it up" with anyone. The government conceded that these were inferences it was drawing, rather than facts. I understood that the government felt strongly about this case, but guideline decisions must be made based on evidence rather than emotion or hyperbole. The facts of the case upon which I had to decide this issue are set forth in the text.

[4]Even if I had considered this information, I would not have applied the enhancement. One may reasonably infer from Burton's statements about filing off the serial number and reporting the gun stolen that he was concerned defendant would get in trouble for the straw purchase if the gun were ever found in Burton's possession.

6

draw from these false statements was that they did not want the illegal transfer discovered and traced back to them. Secrecy alone cannot permit an inference that the transferee in a straw purchase case plans to commit a felony with the gun. Similarly, defendant's "bad feeling" was more reasonably attributed to his knowledge that he was doing something wrong, and that he could get caught and punished, than to a fear that Burton would do something bad.

Nor could I infer based on Burton's stated need for a gun for "protection" that defendant should have known that Burton planned to commit a felony with the gun. Nothing in the record suggested that Burton's statements provided defendant with reason to believe that he planned to use the gun offensively. And there was nothing apparently illegal in a person like Burton, eighteen years old and not a felon or otherwise subject to a known firearms disability, in possessing a gun for self-protection.

My conclusion not to apply the enhancement was further supported by defendant's personal characteristics. According to a report and testing by Dr. Sheryl Dolezal, a licensed clinical psychologist, defendant had an IQ of 62, placing him in the mildly mentally retarded range. He scored in the first percentile in all areas, indicating that 99% of individuals would score higher on cognitive measures than he did. Dr. Dolezal found that defendant functioned academically at the level of a grade school child. To infer that he acquired the requisite knowledge or belief, based on his severe limitations, was not reasonable. A few of Dr. Dolezal's conclusions were particularly pertinent.

First, she noted that defendant was easily taken advantage of by peers, despite his mother's efforts to watch out for him. The report indicated that defendant could be talked into things that were wrong and did not fully understand the consequences of his actions. Defendant reportedly wanted to fit in and did not want others mad at him. In this regard,

7

defendant told Dr. Dolezal that he obtained the gun for Burton because Burton told him people were threatening to kill him, and defendant was concerned about Burton. The report further indicated that defendant had trouble reading and often needed help completing forms.

Second, Dr. Dolezal concluded that: "Based on his limited cognitive abilities he will have significant difficulty with any type of abstract reasoning." (Dolezal Report at 4.) He is unable to "develop alternative conclusions" based on the processing of information. (Id.) "He is also not able to employ critical thinking or reasoning skills. He processes information and operates on a very basic level." (Id.) When it came to making important choices that most adults are required to, Dr. Dolezal concluded that defendant will have "significant difficulty as his thought process is rather simplistic." This suggested that defendant's ability to draw the inferences required by this guideline enhancement was quite limited.

The government argued that defendant's post-arrest statement, in which he admitted that he had a gut feeling something bad was going to happen, refuted the doctor's report. I disagreed. As indicated above, I attributed this statement to defendant's feeling that he was doing something wrong and could get in trouble, not a prediction that Burton would use the gun to commit a felony, much less shoot two police officers.

A thorough review of the case-law supported my conclusion. The cases in which the enhancement has been applied typically involve (1) some suggestion of intent on the part of the transferee to the transferor; (2) some knowledge on the part of the transferor that the transferee is an unsavory character; or (3) a large volume of transfers, suggesting that at least some of the guns might be put to felonious use. The present case involved none of these circumstances.

First, there was no evidence that Burton ever told defendant or suggested to defendant

8

that he planned or intended to use the gun for any sort of criminal behavior. Cf. Wagner, 467 F.3d at 1087-88 (affirming the enhancement where the person to whom the defendant sold guns stated that drug dealers he knew wanted to obtain firearms); Inglese, 282 F.3d at 539 (affirming the enhancement where the buyers, undercover officers, made statements to the effect that they planned to shoot people); Messino, 55 F.3d at 1256 (affirming the enhancement where the transferee posed as a criminal engaged in the business of selling drugs and guns, boasted of his criminal associations, and stated that he was willing to commit murder, and the defendant asked him to kill an ex-girlfriend); Brewster, 1 F.3d at 54-55 (affirming the enhancement where the transferee, an undercover officer, told the defendant-transferor that he needed a gun to facilitate his plan to become a drug dealer).

Second, there was no evidence that defendant knew, should have known or had reason to believe that Burton was a gang member or someone otherwise involved in criminal activity. Cf. Jemison, 237 F.3d at 918 (finding that the defendant had good reason to believe that guns he provided to a street gang would be used in connection with felonious activities). The record demonstrated that Burton was not a felon or otherwise under a firearms disability; it was his youth that prevented him from making the purchase himself.

Third, this was not a case where the volume or timing of purchases or transfers raised red flags. Cf. Caldwell, 448 F.3d at 291-92 (affirming the enhancement where the defendant acquired 52 firearms, transported them out of state and sold them on the street, and tried to obliterate serial numbers); United States v. Mitchell, 328 F.3d 77, 83 (2d Cir. 2003) (affirming the enhancement where the defendant bought 40 guns in Texas and sold them to a man in New York the defendant knew to be a drug dealer); United States v. Martin, 78 F.3d 808, 811-12 (2d Cir. 1996) (affirming the enhancement where the defendant, a New Hampshire gun

9

dealer, sold 87 handguns to three individuals, one of whom was from New York City, in a three month period and falsified his records); Gilmore, 60 F.3d at 393-94 (affirming the enhancement where the defendant repeatedly "lost" guns, knew that the finders were likely to be gang members, knew that one of the guns was found on his cousin, a drug dealer, yet "lost" ten more guns after that); United States v. Rogers, 46 F.3d 31, 32-33 (7th Cir. 1995) (holding that the district court could reasonably infer from the circumstances that the defendant had reason to believe that of the 59 mostly semi-automatic guns he bought in less than two years some would wind up being possessed in connection with felonies). In these cases, courts applied the enhancement despite the lack of hard evidence because, at some point, given the number of guns and the likely recipients, the defendant acquired reason to believe that the guns would be used feloniously. This case involved a single gun. Therefore, the government's reliance on Rogers and like cases was misplaced.

The government also relied on United States v. Charles, 238 F.3d 916 (7th Cir. 2001), but that case too was distinguishable. In Charles, the defendant obtained two handguns from a straw purchaser, then allegedly sold them to a friend, Derrick Waller. Subsequently, someone shot at the brother and mother of the defendant's estranged girlfriend, and the police traced the shell casings to one of the two guns the defendant obtained from his straw purchaser. The girlfriend's mother reported to police that shortly before the shooting she had seen the defendant, Waller, and two others in the area. Police later stopped an automobile being driven by Waller, with Charles as a passenger, searched the vehicle and discovered the firearm used in the two shootings. Id. at 917.

The defendant pleaded guilty to aiding and abetting the straw purchase of the two guns and being a felon in possession of a firearm. On appeal, he challenged the district court's

10

application of the 4-level increase under § 2K2.1(b)(5).[5] Although finding it a close case, the court of appeals affirmed, holding that the district court did not clearly err in drawing the necessary inference based on the defendant's proximity to Waller at the time of the shooting, the defendant's presence with Waller at the time the gun was later discovered by police, and the fact that Waller had no independent reason to attack the defendant's girlfriend's relatives. Id. at 918-19. The district court thus determined that if the defendant did transfer the weapon to Waller, as he claimed,[6] he did so with at least reason to believe, if not intent or knowledge, that it would be used in the shootings.[7] Id. at 919. In the present case, conversely, there was no connection between defendant Collins and the victims of Burton's shootings, and defendant was not present when Burton shot the officers. Nor was there any evidence that defendant was involved in any confrontations Burton had or might later be in.

Based on the lack of evidence, even had I applied an objective standard and ignored defendant's cognitive limitations, the result would have been the same. For all of these reasons, I declined to apply the enhancement.

I therefore adopted the PSR's recommended base offense level of 14, then subtracted 2 levels for acceptance of responsibility, U.S.S.G. § 3E1.1, for a final level of 12. Coupled with

---

[5]The provision has since been re-numbered as § 2K2.1(b)(6).

[6]That the defendant transferred the gun to Waller was less than clear; given the circumstances, it was also possible that the defendant himself committed the shootings.

[7]The post-transfer evidence in Charles was relevant to the defendant's state of mind at the time of the transfer, i.e. it tended to show that the defendant provided the guns to Waller so Waller could shoot the victims on the defendant's behalf.

11

defendant's undisputed criminal history category of I,[8] level 12 produced an imprisonment range of 10-16 months. I turned then to imposition of sentence under § 3553(a).

## II.  SECTION 3553(a)

### A.  Sentencing Factors

Section 3553(a) directs a sentencing court to consider:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the advisory guideline range;

(5)  any pertinent policy statements issued by the Sentencing Commission;

(6)  the need to avoid unwarranted sentence disparities; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The statute requires the court, after considering these factors, to impose a sentence that

---

[8]The PSR assigned 1 criminal history point based on a municipal ordinance violation for carrying a concealed weapon, a small knife. (PSR ¶ 49.) Defendant objected to the scoring of this un-counseled conviction under <u>Custis v. United States</u>, 511 U.S. 485 (1994). Because this dispute did not affect the guidelines or the sentence, I made no formal ruling. <u>See</u> Fed. R. Crim. P. 32(i)(3)(B).

12

is sufficient but not greater than necessary to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public, and rehabilitation of the defendant. While the guidelines will generally be the starting point and the initial benchmark in making this determination, the court may not presume that the guideline sentence is the correct one. Rather, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the court must consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. The court must make an individualized assessment based on the facts presented, then, after settling on the appropriate sentence, adequately explain the chosen sentence. See Gall v. United States, 552 U.S. 38, 49-50 (2007).

**B.     Analysis**

The sentencing guidelines recommended 10-16 months' imprisonment in this case, but the parties both argued for a sentence outside the range. I analyzed each of their requests under the § 3553(a) factors.

The government recommended the maximum term of 10 years, arguing that such a sentence was necessary to reflect the seriousness of the offense, promote respect for the law, and afford adequate deterrence to criminal conduct, given the injuries suffered by the officers, the problem of gun violence in this community generally, and straw purchases more specifically. I understood the government's desire to come down very hard on defendant based on the ultimate consequences of this firearm transfer and to deter other straw purchasers. Given the serious physical and emotional injuries they sustained, there was no doubt that the consequences would, for the officers, continue to be felt long after the court was done with the case.

13

However, I could not conclude that the sentence recommended by the government was necessary to satisfy the purposes of sentencing. First, imposing a maximum sentence in this case would have left no room for increased punishment in a more aggravated case, such as where the defendant clearly knew the transferee planned a homicide, or where the defendant intended that a homicide occur; where the defendant refused to cooperate with or fled from the police at the time of arrest; where the defendant denied guilt and went to trial; or where the defendant had a bad prior record. See United States v. Kirkpatrick, No. 09-2382, 2009 WL 4756227, at *1 (7th Cir. Dec. 14, 2009) (stating that "leaping close to the statutory maximum creates a risk of unwarranted disparity . . . because it leaves little room for the marginal deterrence of persons whose additional deeds are more serious"); see also United States v. Newsom, 402 F.3d 780, 785-86 (7th Cir. 2005) (discussing the idea of marginal deterrence, and suggesting a lesser sentence on remand because the sentence imposed left little room for worse offenders).

Second, as the Seventh Circuit explained in Kirkpatrick, before imposing a sentence well above the guideline range, "it is wise to see how much incremental punishment the Sentencing Commission recommends." Id. at *1. In support of its recommendation here, the government cited U.S.S.G. § 2K2.1(c), which allows the court to apply a cross reference to another guideline if "the defendant . . . possessed or transferred a firearm or ammunition with knowledge or intent that it would be used or possessed in connection with another offense." The guideline then directs the court to use the guideline for attempt, solicitation, or conspiracy in respect to that other offense, if the resulting offense level is greater than that determined under § 2K2.1, or if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined under

14

§ 2K2.1. U.S.S.G. § 2K2.1(c)(1). The government stated that the guideline range for attempted murder (Burton's crime) would be well above the statutory maximum sentence it sought in this case. The problem with this argument was that there was absolutely no evidence that defendant transferred the gun with "knowledge or intent" that it be used to shoot the two police officers. The government made no attempt to so argue under the guidelines, instead relying on the "reason to believe" language in seeking the enhancement under § 2K2.1(b)(6).[9] (Govt.'s Mem. in Aid of Sentencing at 5.) Given these facts, the Commission's approach did not support the government's request. See Kirkpatrick, 2009 WL 4756227, at *2 (reversing where the above-guideline sentence imposed would be consistent with the guidelines only if the defendant actually set out to have a federal agent murdered, while the district court specifically found that the defendant "was all bark and no bite").[10]

The government also relied on United States v. Kitchen, 87 Fed. Appx. 244 (3d Cir. 2004), where the appellate court upheld an upward departure based on the use of a gun, transferred by the defendant, in a road-rage shooting thirteen months later. That case did not fully support the government's request, for two reasons. First, the district court in Kitchen imposed a modest 2-level departure; it did not leap to the statutory maximum. The court of appeals noted with approval the district court's decision to limit the extent of the departure

---

[9] Even then, the government made no argument that defendant had any reason to believe that Burton would shoot police officers. Rather, it relied on the inference that Burton planned to shoot at his unidentified enemies on the east side.

[10] As Kirkpatrick explained, above-guideline sentences need not be explained in guideline terms. Nevertheless, before imposing extra punishment based on extra crimes, the court should consider the Commission's approach. Id. at *1. The government's recommendation in this case was far above any sentence the guidelines could support and inconsistent with the facts of the case.

15

based on the defendant's "attenuated role" in the shooting victim's injuries. Id. at 248. Here, to the extent that defendant bore blame for Burton's shooting of the officers, his role too was attenuated. As discussed, the record contained no evidence that defendant knew, intended or had any reason to believe that Burton would use the gun in the manner he did. Second, and relatedly, the district court in Kitchen first imposed the 4-level guideline enhancement under § 2K2.1(b)(6) based on the defendant's illegal re-sale of 19 guns, including to known drug dealers. The court of appeals noted that this enhancement reinforced its conclusion that the defendant was aware of the risk of injury he created. Id. at 247 n.5. I declined to impose that enhancement in the present case.

The government next cited United States v. White, 979 F.2d 539 (7th Cir. 1991). In that case, the district court did depart to the statutory maximum, but there the defendant "knowingly risked" the teen-aged victim's death by putting her on the street as a prostitute. Nothing similar occurred in the present case, for the reasons I stated in declining to impose the § 2K2.1(b)(6) enhancement.

Finally, the manner in which defendant approached this case – as well as his other personal characteristics – made the government's request unreasonable. First, defendant promptly admitted his conduct on arrest, providing a complete, Mirandized statement. He then entered pleas to both counts of the indictment without any agreement with the government. He advised the PSR writer that he had been "hurting" since the day he learned the officers were shot, regretted purchasing the gun, and thought about the injured officers everyday. He expressed remorse during his in-court allocution.

Second, at age twenty-two, defendant had no prior criminal record, suggesting no great need to protect the public. Further, Dr. Dolezal's report provided significant insight into

16

defendant's ability to understand the consequences of his actions and thus his culpability. According to the Wechsler Adult Intelligence Scale, defendant's IQ was 62, placing him in the mildly retarded range. An academic achievement test placed him at the end of the kindergarten range. His reading and cognition levels were at the beginning first grade level; his math computation at the beginning second grade level; and his sentence comprehension at the mid-third grade level. In her statement to the PSR writer, defendant's mother confirmed Dr. Dolezal's findings, stating that he had always been slow, had trouble reading, and was easily influenced by others because of his low functioning. His sister, with whom he lived, likewise indicated that he had trouble focusing and understanding what was happening around him. The PSR writer similarly indicated that while defendant was cooperative during the interview, he appeared to have trouble comprehending the questions asked of him.[11]

For all of these reasons, I concluded that a sentence at the statutory maximum was not necessary to satisfy the purposes of sentencing. However, I also disagreed with the recommendation by the defense for a probationary sentence. As the government noted, gun violence and illegal gun transfers represent a serious problem in Milwaukee. See United States v. Cavera, 550 F.3d 180 (2d Cir. 2008) (holding that the district court may consider local problems under § 3553(a)), cert. denied, 129 S. Ct. 2735 (2009). In order to satisfy the need for general deterrence a substantial prison term was necessary in this case. See United States v. Politano, 522 F.3d 69, 73-74 (1st Cir.) (affirming above-guideline sentence in illegal gun sale case based on problems in the local community and the need for general deterrence), cert. denied, 129 S. Ct. 133 (2008).

---

[11] I discussed defendant's other personal characteristics on the record at the sentencing hearing. His correctional needs included substance abuse treatment and obtaining a GED.

17

As the government explained in its memorandum and as discussed in recent media reports, firearms obtained in the same manner as in this case are regularly used in criminal activity in the City of Milwaukee. Firearms obtained from Badger Guns have accounted for about a third of all crime guns recovered by Milwaukee police, and guns from that store were used to shoot each of the six Milwaukee police officers wounded in the past two years.[12] (Govt.'s Mem. in Aid of Sentencing at 13-14.) The sentence imposed in cases like this one must be sufficient to deter those straw purchasers who put guns onto the streets. As the government also noted, the class of straw purchasers – by definition adults without records – may be more amenable to deterrence than other classes of defendants.

Under all of the circumstances, I found that a prison sentence was needed here – indeed, a sentence somewhat above the guideline range. I acknowledged defendant's personal characteristics, including his limited capacity and lack of record, which mitigated the case to a certain extent. He did not transfer the gun to a prohibited person. He refused to buy the extra magazines Burton wanted and did not report the gun stolen, as Burton requested. His crime, at its essence, was one of lying on the ATF form. Therefore, lengthy prison was not needed to provide just punishment given his specific conduct and limited capacity. I also did not see him as a serious danger to the community, based on his lack of record and other characteristics. He cooperated fully in this case and expressed remorse.

Based primarily on the need to deter and promote respect for the law, I found a prison sentence of 24 months appropriate in this case. This sentence was sufficient to satisfy all of the purposes of sentencing, but not greater than necessary to accomplish those ends. The

---

[12]Defendant did not dispute these statistics.

18

sentence was within the guideline range had I applied the enhancement under § 2K2.1(b)(6) and thus not out of line with the Commission's general approach in these types of cases. The sentence would have been the same regardless of my resolution of the guideline dispute. See United States v. Sanner, 565 F.3d 400, 406 (7th Cir. 2009). The sentence varied modestly from the guidelines and thus created no unwarranted disparity. Nor was it significantly out of line with the sentences in similar cases in this district, as set forth in the defense sentencing memorandum.

### III.  CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 24 months. I recommended that he be placed at an institution as close to Milwaukee as possible and participate in any substance abuse treatment and GED classes available. On release, I ordered him to serve two years of supervised release, with a drug aftercare and other conditions that appear in the judgment.

Dated at Milwaukee, Wisconsin, this 11th day of January, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge